IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

    v.

QUINCY D'OWN NASH,
a.k.a. Quincy Nash,

        Defendant.

Crim. No. 17-2487 MV

## **MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on defendant Quincy D'Own Nash's Motion to Suppress Physical Evidence and Statements and Corrected Motion to Suppress Physical Evidence and Statements. [Docs. 15, 32].[1] The government opposes the motions. Based upon the pleadings of the parties, the facts of this case and applicable law, Mr. Nash's motions are hereby granted.

### **I. Background**

On the evening of September 17, 2016, Hobbs Police Department Officer Jayson Hoff stopped a 2000 silver Cadillac Escalade for throwing a lit cigarette out the window and having an unreadable license plate. According to his report, Officer Hoff approached the car and, while

---

[1] In his original motion, Mr. Nash alleged that, after the initial traffic stop, "Mr. Tafoya was arrested when he was ordered from his car at gunpoint." [Doc. 15 at 4]. In his amended motion filed January 7, 2018, Mr. Nash corrected the reference to "Mr. Tafoya," but still stated that he was "arrested when he was ordered from the car at gunpoint." [Doc. 32 at 4]. During the hearing, however, Mr. Nash presented no evidence supporting his allegation that he was ordered from the car at gunpoint. Officer Jayson Hoff testified that he did not order Mr. Nash out of the car at gunpoint and, in fact, never drew his gun. [TR at 31]. Officer Drew Buescher testified none of the officers ever drew their guns. [TR at 114].

talking to the driver, Mr. Nash, he observed signs that he was intoxicated. The driver told him he had a previous DUI conviction and had served time in federal prison for possession of drugs. Officer Hoff's video recorder was not functioning, so he requested backup with working video for a field sobriety test. Two other officers arrived.

Officer Hoff ordered Mr. Nash out of the car and conducted a pat down search for weapons, holding Mr. Nash's hands behind his back as he did so. No weapons were detected, but the officer felt what he believed to be a baggie of drugs in Mr. Nash's pants pocket. He asked for permission to reach into the pocket, but Mr. Nash refused. Officer Hoff stated that he was going to reach into the pocket anyway. Mr. Nash jerked away and tried to run, but was tackled by the three officers and arrested.

Officers searched Mr. Nash's person and removed two baggies from his pants pockets. One field tested positive for methamphetamine and the other for marijuana. When officers searched the car, which belonged to Mr. Nash's grandmother, they found a firearm under the front seat.

Defendant was charged with possession with intent to distribute five grams and more of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B) and 18 U.S.C. § 2; possession of a firearm and ammunition in furtherance of a federal drug trafficking crime, in violation of 18 U.S.C. § 924(c); and felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).

Pursuant to Fed. Crim. R. 12(b)(3)(C), Mr. Nash moves for suppression of any physical evidence or statements seized as a result of his September 17, 2016 detention, search and arrest; and any statements made by him after his detention and arrest.

## II. Analysis

Mr. Nash asserts any evidence garnered during the traffic stop should be suppressed because:

A. Officer Hobbs lacked reasonable suspicion to execute the traffic stop;

B. Officer Hobbs lacked reasonable suspicion of criminal conduct on Mr. Nash's part to prolong the traffic stop beyond its original purpose;

C. The officer's pat down was illegal because he lacked a specific articulable suspicion of danger that would permit a pat down; and

D. Even if the officer had a specific articulable suspicion of danger which would permit a pat down, when the officer went from conducting a pat down looking for weapons to trying to seize evidence of a crime, police "crossed the line," and any evidence seized from that point forward should be suppressed.

The Court considers each of Mr. Nash's arguments in turn and finds that the government has failed to carry its burden of showing Officer Hoff had not completed his pat down before locating what he believed to be a baggie of dope in Mr. Nash's pocket. Therefore, Mr. Nash's Motion to Suppress must be granted.

### A. The Initial Traffic Stop Was Based on Reasonable Suspicion.

The government bears the burden of proof to justify warrantless searches and seizures. *United States v. Zubia-Melendez*, 263 F.3d 1155, 1160 (10th Cir. 2001) (citing *United States v. Maestas*, 2 F.3d 1485, 1491 (10th Cir. 1993). A traffic stop is treated as an investigative detention, and is governed by the standards set forth in *Terry v. Ohio*, 392 U.S. 1 (1968). *United States v. Bradford*, 423 F.3d 1149, 1156 (10th Cir. 2005). To determine the reasonableness of an investigative detention, the Court makes a dual inquiry, asking first "whether the officer's action

was justified at its inception," and second, "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Id*. Mr. Nash argues neither prong has been met in this case.

"A traffic stop is justified at its inception if an officer has (1) probable cause to believe a traffic violation has occurred, or (2) a reasonable articulable suspicion that a particular motorist has violated any of the traffic or equipment regulations of the jurisdiction." *United States v. Winder*, 557 F.3d 1129, 1134 (10th Cir. 2009) (citing *United States v. Martinez*, 512 F.3d 1268, 1272 (10th Cir. 2008)). *See also United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995) ("A traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has a reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring.").

The Tenth Circuit "ha[s] long since rejected the notion that an officer's subjective motivations in effecting a stop are relevant to the *Terry* analysis." *Winder*, 557 F.3d at 1134 (10th Cir. 2009) (citations omitted). "Instead, we consider the reasonableness of an officer's actions using an 'objective standard' that takes the 'totality of the circumstances' and the 'information available' to the officer into account." *Id.* (citing *United States v. Sanchez*, 519 F.3d 1208, 1213 (10th Cir. 2008)). "Under this standard, an officer's 'actual motivations or subjective beliefs and intentions' are, quite simply, irrelevant." *Id.* (quoting *United States v. DeGasso*, 369 F.3d 1139, 1143 (10th Cir. 2004)). "We ask, instead, whether 'the facts available' to the detaining officer, at the time, warranted an officer of 'reasonable caution' in believing 'the action taken was appropriate.'" *Id.* (citing *Terry*, 392 U.S. at 2122).

"For reasonable suspicion to exist, an officer 'need not rule out the possibility of innocent conduct;' he or she simply must possesses 'some minimal level of objective justification' for

making the stop." *Winder*, 557 F.3d at 1134 (quoting *United States v. Vercher*, 358 F.3d 1257, 1261 (10th Cir. 2004)). "Evidence falling 'considerably short' of a preponderance satisfies this standard." *Id.* (quoting *United States v. Arvizu*, 534 U.S. 266, 274 (1968)). "[I]f a traffic stop was justified at its inception, we determine whether 'the resulting detention was reasonably related in scope to the circumstances that justified the stop in the first place.'" *Id.* (quoting *United States v. Valenzuela*, 494 F.3d 886, 888 (10th Cir. 2006)). "'Generally, an investigative detention must last no longer than is necessary to effectuate the purpose of the stop.'" *Id.* (quoting *United States v. Cervine*, 347 F.3d 865, 870-71 (10th Cir. 2003)).

Officer Hoff testified that he stopped Mr. Nash because (1) he threw a lit cigarette butt out of the car, in violation of NMSA 30-8-4 (littering), and (2) his license plate was not clearly legible, in violation of NMSA 66-3-18 (Display of Registration Plates). [TR at 9-11]. Officer Hoff issued citations to Mr. Nash for both infractions. [Govt. Exs. 2-3].

Mr. Nash denies he threw a cigarette out the window and asserts he is not a smoker. However, during the stop, after Officer Hoff told him he had seen him throwing a lit cigarette out the window, Mr. Nash responded, "I'm sorry . . . I did not think that was bad. . ." [Govt. Exs. 4; 4(a) at 7; TR at 23]. Moreover, after Mr. Nash's arrest, a lighter and a pack of grape flavored Swisher sweet cigars were found in his pocket. [Govt. Ex 5; TR at 112]. Therefore, the Court concludes that the facts available to Officer Hoff at the time warranted his belief that "the action taken was appropriate." *Winder*, 557 F.3d at 1134.

With respect to the license plate, Officer Hoff testified that "[a]s I got closer to the vehicle, I had to get extremely close because I having a hard time reading the license plate. There was a lot of glare on the license plate, which drowned out the letters and numbers, and I had to get extremely close . . . approximately 10 feet." [TR at 10]. Pursuant to New Mexico

law, a license plate must be maintained in a condition that makes it clearly legible. NMSA 66-3-18. But Officer Hoff acknowledged on the witness stand that in a later picture of the car's license plate taken during daylight hours [Govt. Ex. 9], he could see the letters and numbers clearly. [TR at 53]. Further, on cross-examination by Mr. Nash's attorney, he admitted that after seeing Ex. 9, he had sent the government's attorney an email stating, in part, "The plate is pretty clear. I was wrong." [TR at 55].

However, "[t]hat an officer's suspicions may prove unfounded does not vitiate the lawfulness of a stop, provided the officer's error was made in good faith and is objectively reasonable under the circumstances." *Winder*, 557 F.3d at 1134 (citation omitted). "Police errors, in this context, are simply unavoidable, as reasonable suspicion involves 'probabilities' rather than 'hard certainties.'" *Id.* (citations omitted). The Court concludes that if, in fact, the officer was wrong about the license plate, his error was made in good faith and was objectively reasonable under the circumstances.

Because the facts available to Officer Hoff at the time warranted his belief that the action taken was appropriate, the Court rejects Mr. Nash's argument that the initial stop was illegal. Moreover, with respect to the readability of the license plate, even if the Court were to conclude that facts available to Officer Hoff at the time did not warrant an officer of reasonable caution in believing the action taken was appropriate, the stop was nonetheless warranted based upon the littering infraction. Accordingly, the Court rejects Mr. Nash's argument that Officer Hoff lacked reasonable suspicion to execute the traffic stop.

**B. Officer Hoff Had Reasonable Suspicion to Prolong the Traffic Stop.**

After questioning Mr. Nash about whether he was under the influence of alcohol or drugs, Officer Hoff radioed dispatch requesting backup for a field sobriety test. [Govt. Exs 4,

4(a) at 8-9]. He testified this was because the video camera on his car was full, and he needed a police car with video capability. [TR at 23, 26].

A traffic stop permissible at its inception "may be expanded beyond its original purpose . . . if during the initial stop the detaining officer acquires reasonable suspicion of criminal activity, that is to say the officer must acquire a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *United States v. Clarkson*, 551 F.3d 1196, 1201 (10th Cir. 2009) (quoting *United States v. Villa-Chaparro*, 115 F.3d 797, 801-02 (10th Cir. 1997). An "inchoate and unparticularized suspicion or 'hunch' is insufficient" to support reasonable suspicion." *United States v. Hall*, 978 F.2d 616, 620 (10th Cir. 1992) (citation omitted). "Reasonable suspicion represents a minimum level of objective justification which is considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1260 (10th Cir. 2006) (citations omitted). However, "[i]nchoate suspicions" and "unparticularized hunches" based on indicators "so innocent or susceptible to varying interpretations as to be innocuous" cannot justify a prolonged traffic stop or vehicle search. *United States v. Wood*, 106 F.3d 942, 946 (10th Cir. 1997)

The Court looks at the "totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing.'" *United States v. Santos*, 403 F.3d 1120, 1134 (10th Cir. 2005) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quotations omitted). In so doing, the Court must "allow[] officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person. *Id.* at 1124 (quoting *Arvizu*, 534 U.S. at 273).

Officer Hoff testified that he prolonged the initial stop based on the following factors:

- **Inconsistencies Between Officer's Observations and Mr. Nash's Statements**

The encounter between police and Mr. Nash began when a silver 2000 Cadillac Escalade turned northbound from the Four Seasons Apartments in front of Officer Hoff at approximately the 2400 block of North Jackson Street. [TR at 10]. After the stop, when the officer asked him where he had been coming from, Mr. Nash stated that he had been doing some roofing jobs and lawn care with a friend earlier, and had dropped him off at the Broadway Apartments "[o]ver there where them apartments is out there." [Govt. Exs. 4, 4(a) at 4-5]. Officer Hoff then asked him where the Broadway Apartments were, and Mr. Nash responded, "It's, uh—uh, on Broadway." [Govt. Exs. 4, 4(a) at 5]. The officer asked, "[W]eren't you just pulling outta this apartment complex?" and Mr. Nash then stated that he had driven through the complex because he was "seeing if this girl was home, but she wasn't there. I just—I—I think you was behind way back there when I went through the complex 'cause I was gonna see if that girls was there." *Id.* The officer responded, "Huh-uh. I wasn't at the complex. I was on Jefferson, bud." *Id.*

- **Mr. Nash's Appearance, Speech and Demeanor**

After Mr. Nash's vehicle stopped, Officer Hoff approached it, asked him to roll down the driver side window, and told him he had stopped him for throwing a cigarette out the window and because his license plate was "corroding away" and the letters were hard to see. [Govt. Exs. 4, Ex. 4(a) at 2-3; TR at 13-14]. Officer Hoff testified that during the initial stop, Mr. Nash's eyes were bloodshot and watery, and his speech was very slow and lethargic, leading the officer to believe he was under the influence. [TR at 19-20]. He stated: "My training and experience teaches that some of the very common indicators for someone driving under the influence are bloodshot, watery eyes, inconsistencies in stories, inability to articulate normally, clearly, slurred speech." [TR at 20]. The audio recording confirms that Mr. Nash's speech seemed to be slow

and slurred. [Ex. 4].] The officer asked Mr. Nash how much he had to drink that evening, to which he replied, "None, sir." [Govt. Exs. 4, 4(a) at 6; TR at 21]. Mr. Nash also denied being under the influence of drugs, and reiterated that he had been doing yards and had allergies. *Id.* Officer Hoff replied, "[W]ell, I'm not talking to you 'cause, uh, it sounds like you got allergies. You got bloodshot, watery eyes, and your speech is very lethargic, very— . . . . struggling." [Govt. Exs. 4, 4(a) at 6-7]. Mr. Nash responded, "You make me nervous. Uh, I ain't did nothing," and "you pulled me over for no reason." [Ex. 4, Ex. 4(a) at 7]. The officer told him again that he had pulled him over because his license plate was corroded and he had thrown a cigarette out and that was littering. *Id.* Mr. Nash responded, stating, "I'm sorry about that," and "I didn't think that was bad, I mean, for, uh, a cigarette." *Id.*

Officer Hoff also testified that Mr. Nash's level of nervousness concerned him. He stated that while people pulled over for a traffic violation might initially be nervous, over "the prolonged portion of the conversation, nerves usually go right away," and based on his training and experience, "We were just having a normal conversation at that point" and "the nerves didn't make any sense to me." [TR at 22].

The Court finds that the inconsistencies between Mr. Nash's statements and Officer Hoff's previous observations of where he was coming from; his nervousness; and his observation that Mr. Nash had slurred speech, bloodshot and watery eyes, and that his breath smelled of alcohol, provided a particularized and objective basis for suspecting he was under the influence of alcohol and/or drugs. Therefore, the Court concludes that the officer was justified in lengthening Mr. Nash's detention.

**C. Officer Hoff Had Reasonable Suspicion to Conduct a Pat Down.**

In *Terry*, the Supreme Court held that if an officer has reasonable suspicion that a suspect

9

is "armed and dangerous," the officer may conduct "a reasonable search for weapons for the protection of the police officer" without violating the Fourth Amendment. 392 U.S. at 27.

After backup arrived, Mr. Nash exited the car at Officer Hoff's request. [Govt. Exs. 4, 4(a) at 14]. The officer asked him if he had any weapons on him, and Mr. Nash said he did not. *Id.* Officer Nash testified that when Mr. Nash got out of the car, he observed two large bulges in the front two pockets of his jeans. [TR at 31].

Officer Hoff testified that the following facts made him believe Mr. Nash could be armed and dangerous:

- **Mr. Nash's Delay in Pulling Over**

After the officer turned on his lights to initiate the stop, Mr. Nash did not stop immediately, but instead turned westbound on Highland, continued slowing for about a half block, then turned southbound onto Travis and continued approximately another half a block, before turning onto Bell and coming to a stop near his residence. [TR at 11]. Subsequently, family members and neighbors began to gather nearby.

Mr. Nash's delay in stopping concerned the officer because, based on his training and experience, he believed it could be an issue with intoxication or "they could be positioning themselves in a way tactically to harm me or positioning themselves in the vehicle to escape or flee detainment at that time. They could be setting themselves up in a situation to hurt someone from the community or someone in that vehicle." [TR at 11-12]. Additionally, Officer Hoff was worried "someone could possibly be arming themselves if they had [a] weapon in a specific place and they had to retain it and get it on their person [to] put themselves in a position to be able to use, buying that amount of time by now pulling [over] right away was a concern of mine as well." [TR at 12].

10

- **The Officer's Belief that Mr. Nash was Under the Influence**

As previously noted, Officer Hoff believed, based on Mr. Nash's appearance and speech and the inconsistency of his story, that Mr. Nash was under the influence of drugs or alcohol.

- **Mr. Nash's Disclosure of His Criminal History**

While they waited for backup, Mr. Nash told the officer he had a prior DUI conviction, and that he had been in federal prison for seven years for possession of cocaine and methamphetamine, and was currently on probation. [Govt. Exs. 4, 4(a) at 11-14, TR at 23-24]. Officer Hoff testified this disclosure concerned him because, based on his training and experience, "seven years is an extremely long time for just possession of those two controlled substances. I was concerned there might be more to the story, and we may be dealing with distribution or trafficking of those things, of those illegal narcotics." [TR at 24-25].

> The officer testified:
>
> Now, my immediate concern would be if he has—if he has been convicted of that and he was still involved in that enterprise, one of the absolute guaranteed tools with that are weapons, dangerous weapons, deadly weapons. And I was concerned if that's the case, this may—I may now be dealing with an individual that could be under the influence and could very well be armed and dangerous.

[TR at 25-26]. Additionally, he testified he believed Mr. Nash might be armed because:

> I believe[d] that if Mr. Nash, due to his own admission, was still actively involved in the drug game in any way for his own benefit, there's no doubt that 100 percent, guns are what protect their enterprise and that subject could very well be carrying a gun and it would be expected on my part as an officer.

[TR at 32]. Officer Hoff also testified that he was concerned Mr. Nash worried about taking a field sobriety test because he could end up in jail, and that, as a result, Mr. Nash might try to flee. [TR at 33]. He believed Mr. Nash "ha[d] a high level of potential of being dangerous and willing to do anything to get away with [his] freedom." *Id.*

Finally, Officer Hoff testified he was also worried because, while Mr. Nash initially

11

seemed very lethargic in his communication, he became progressively more irritated and aggressive, stating, "You pulled me over for nothing;" and calling his wife and telling her to "come out here—the police are messing with me." [TR at 33-34]. The officer testified that this concerned him because "[w]hen someone is under the influence especially their inhibitions or maybe their judgment can be off—[a]nd when someone is irritated, they could absolutely be a threat to me." *Id.* at 34.

- **The Field Sobriety Test**

Officer Hoff testified that the standard field sobriety test consists of three parts: the horizontal gaze nystagmus, the walk-and-turn, and the one-legged stand. [TR at 27]. The horizontal gaze nystagmus is an eye test, during which the officer is watching an individual's eyes. [TR at 28]. In the walk-and turn, the individual takes a series of heel-to-toe steps: nine down, a directed turn, nine back, along an imaginary straight line while keeping the hands down by their side. [TR at 29]. During the test, the officer's eyes are trained primarily on the individual's feet. *Id.* In the one-legged stand, the individual is directed to stand with their hands down by their sides and raise one foot approximately six inches off the ground, keeping it parallel to the ground, and count until the officer tells them to stop. [TR at 30]. During these tests, the officer's attention is diverted, and the individual's hands are down by their sides. [TR at 27-31].[2]

Officer Brandon Marinovich, who arrived on the scene after Officer Hoff radioed for

---

[2] The field sobriety test was never performed, nor was Mr. Nash subjected to a breathalyzer or blood test to establish whether he was under the influence of drugs or alcohol. [TR at 68]. Officer Hoff testified that this was because, pursuant to department policy, after Mr. Nash was arrested and taken to the Hobbs city jail, he had to be provided medical attention and interviewed by a supervisor. *Id.* at 68-69. The officer testified that, based on his training and experience, DWI testing should be conducted within the relative time of the investigation of the traffic stop, and it is not feasible to conduct testing 45 minutes after encountering the suspect. *Id.* at 73.

12

backup, testified that he, too, noticed bulges in Mr. Nash's pants pockets. [TR at 96]. He testified that the bulges in Mr. Nash's pockets were relevant because Officer Hoff would be "focused on multiple different areas" while conducting the field sobriety test and he—Officer Marinovich—would be "watching the surroundings, not just Officer Hoff and the driver. I'm watching my back, the officer's back, the houses." *Id.*

Officer Marinovich had positioned his car to video the field sobriety test, and was standing near the vehicle so he could reach in and push the record button, but had not yet turned the video recorder on when Officer Hoff conducted the pat down. [TR at 96, 105]. He testified that the camera system is a small screen towards the passenger side of the vehicle, and that when Mr. Nash broke away from Officer Hoff, he did not have time to reach in and turn the screen on before joining in the pursuit of Mr. Nash. [TR at 105].

Based on Mr. Nash's delay in pulling over, the officer's belief that he was under the influence of drugs or alcohol, the disclosure of his criminal history, and the risks posed by the anticipated field sobriety test, the Court concludes that Officer Hoff had a reasonable suspicion that Mr. Nash was armed and dangerous, and that, therefore a pat down for weapons was appropriate. *Terry*, 392 U.S. at 27.

### D. Officer Hoff Did Not Have Probable Cause to Reach into Mr. Nash's Pocket.

Officer Hoff testified that during his pat down of Mr. Nash, he felt what he believed to be a baggie in Mr. Nash's left front pants pocket, and that, consistent with his training and experience, he believed it to be "dope." [TR at 35]. He asked if it was a baggie, and Mr. Nash said, "no." [Govt. Exs. 4, 4(a) at 14-15; TR at 35]. The officer asked, "Can I reach in there and get it? . . . . It feels like a bag of dope." [Govt. Exs. 4, 4(a) at 15]. Mr. Nash responded, "Am I

13

under arrest?" *Id.*,[3] and the officer said, "I'm gonna reach in there and get it. . ." [Govt. Exs. 4, 4(a) at 15]. According to testimony from police officers, Mr. Nash then broke away and tried to run. [TR at 35 (Officer Hoff); TR at 97 (Officer Marinovich); TR at 111 (Officer Buescher)]. He was tackled, handcuffed, and arrested. [TR at 35-36 (Officer Hoff); TR at 97-98 (Officer Marinovich); TR at 111-113 (Officer Buescher)]. Officer Buescher conducted a search of Mr. Nash incident to arrest. [TR at 113]. In Mr. Nash's right front pants pocket, the officer found a baggie of what appeared to be marijuana, and in his left front pants pocket, he found a baggie of a white crystalline-like substance, which he recognized as an illegal narcotic. [TR at 112-113]. The baggie from his left front pants pocket field tested positive for methamphetamine. [TR at 113-114]. The baggie from his right front pants pocket field tested positive for marijuana. [TR at 113-114].

As previously noted, under *Terry*, if an officer has a reasonable suspicion that the suspect is armed and dangerous, he may conduct a protective frisk to discover weapons. 392 U.S. at 29-30. And in *Minnesota v. Dickerson*, 508 U.S. 366, 371 (1993), the Supreme Court held that contraband detected through the sense of touch during a pat down may be admitted into evidence. However, in *Dickerson*, the Court also held that "[An] officer's continued exploration of [a suspect's] pocket after . . . conclud[ing] that it contain[s] no weapon [i]s unrelated to the sole justification of the search under *Terry*: the protection of the police officer and others nearby." *Id.* at 378 (brackets, ellipsis, and internal quotation marks omitted)). *See also United States v. Perez*, 308 Fed. Appx. 198, 201 (10th Cir. 2011) (unpublished) ("Once the

---

[3] In response to the Court's questioning, Officer Hoff testified that while Mr. Nash was not under arrest at the time of the pat down, the officer considered him to be detained. [TR at 83]. Officer Hoff stated that "[d]etention only means that he is not free to leave the scene as I continued investigating a crime. Not that he is under arrest, placed in handcuffs, put in the back of cars. His freedom is only detained for the purpose of the investigation." *Id.*

protective frisk is complete . . . further searching of the suspect is improper absent probable cause.").

Officer Hoff testified as follows:

> I asked [Mr. Nash] to step in front of Officer Marinovich's patrol unit, and explained to him that I was going to conduct a pat down for weapons. And then I secured Mr. Nash's hands behind his back. I held his fingers, and I swiped the outside of his hands behind his back. I held his fingers, and I swiped the outside of his clothing with the inside of my hand on the right side and then the left.
>
> * * *
>
> When I was patting down the left front pocket, I heard and felt a crackle, which I knew, through my training and experience, to be a plastic baggie or Ziplock baggie. And I felt a bulge, which was consistent through my training and experience, to be dope, as I worded it."

[TR at 34-35]. In like manner, in his Affidavit for Search Warrant, Officer Hoff stated, "I secured Quincy's hands behind his back and felt what I believed to be a plastic baggy from the outside of his pants pocket within his front left pocket." [Def. Ex. A at 25].

The audio recording of the stop, however, conflicts with Officer Hoff's testimony and his statement in his Affidavit that he felt a baggie in Mr. Nash's left front pocket:

> OFFICER HOFF: Do you mind—I'm gonna pat you down real quick just to make sure you don't have any weapons so we can all operate freely. Go ahead and put your hands [INAUDIBLE]. All right. Put your hands behind your back. Right there. Okay? I notice this *right pocket*, you got a lotta stuff going on. Is that a baggy?
>
> MR. NASH: No.
>
> OFFICER HOFF: Can I reach in there and get it? [Inaudible]. It feels like a bag of dope.
>
> MR. NASH: Am I under arrest?
>
> OFFICER HOFF: I'm gonna reach in there and get it. Don't—

[Govt. Exs. 4, 4(a) at 14-15) (emphasis added).]

Based on the conflict between the audio recording of the stop and Officer Hoff's

15

testimony, it is unclear which pocket he felt the baggie in. Moreover, as in *Perez*, Officer Hoff never testified that he found the baggie before he determined that Mr. Nash had no weapon on his person. At first blush, this might seem trivial, but pursuant to *Dickerson*, the Court is required to determine whether Officer Hoff had completed the pat down for weapons before he felt what he believed to be drugs in one of Mr. Nash's pockets. Had the pat down been videotaped, it might have shed light on this issue. Based on the record before it, however, the Court cannot conclude that Officer Hoff had not completed the pat down before he discovered the baggie.

Finally, the Court questions whether the mere presence of a baggie in Mr. Hoff's pocket was enough to justify a conclusion that the baggie contained illegal drugs. As the Tenth Circuit has stated:

> As an experienced police officer, [the officer] may be uniquely qualified to distinguish between contraband and non-contraband items based on texture. Nevertheless, how it was immediately apparent that a small plastic bag, concealed within the fabric of [Defendant's'] pants, contained marijuana and not anything from a range of other, non-contraband substances is unclear.

*U.S. v. Holmes*, 311 Fed. Appx. 156, 160 (10th Cir. 2009) (unpublished).

Accordingly, the Court concludes that the government has failed to carry its burden of showing that Officer Hoff had probable cause to attempt to reach in Mr. Nash's pocket. Because the illegal drugs in Mr. Nash's pockets and the weapon and ammunition in his car were obtained as a result of Officer Hoff's attempt to reach into Mr. Nash's pocket, they are fruits of the poisonous tree and must be suppressed.

### III. Conclusion

For the reasons set forth above, Mr. Nash's Motion to Suppress [Docs. 15, 32] is hereby granted.

ENTERED this 9th day of March, 2018.

_____
MARTHA VAZQUEZ
UNITED STATES DISTRICT JUDGE


| | |
|---|---|
| George A Harrison, | Joni Lee Autrey and Mark A. Saltman |
| *Attorney for Mr. Nash* | ASSISTANT UNITED STATES ATTORNEYS |
| | *Attorneys for the United States* |